BAKER LEAD MFG. CO. v. NATIONAL LEAD CO.

(Circuit Court, D. New Jersey. February 27, 1905.)

PATENTS—INFRINGEMENT—LEAD TRAPS.

The Robinson patent, No. 406,146, for a method of forming the bottoms of lead traps by spinning an end section on a tube or cylinder under pressure or friction sufficient to cause the metal to flow and unite and form a homogeneous, seamless, and complete bottom, was not anticipated, and is valid. Also *held* infringed.

In Equity. Suit for infringement of letters patent No. 406,146, for a method of making lead traps, granted to Alpheus A. Robinson July 2, 1889. On final hearing.

Louis W. Southgate, for complainant.
Henry M. Brigham, for defendant.

ARCHBALD, District Judge.[1] This case is of no serious difficulty. The patent in suit, to my mind, is clearly valid, and the defendants

---

[1] Specially assigned.

have just as clearly infringed it. It covers a process which is a valuable contribution to the art of lead-trap making, and it is not anticipated by anything which had gone before. The sanitary value of drum or cylinder traps, as contrasted with others, such as the familiar S trap, does not concern us. They must have merits, or they would not be in such demand as they are. A prime necessity, however, of such a trap, is that it shall have a solid, homogeneous, and integral bottom, which shall not only be free from imperfections, so as to be watertight, but shall also be sufficiently thick to resist the scouring and consequent weakening from the dirt and sediment flushed through it. If lead is used, as it must be in the great majority of cases, it cannot be molded or cast, on account of the liability to blowholes. This was the difficulty with the McCloskey patent (1884), to which reference is made by the defendants, but which calls for no particular notice. Neither can the end or bottom of the trap be fashioned by hammering; a union of the parts in this way being no more feasible than by rolling or pressing, however great. And if the seams which are left be closed with solder, the lead is laid open to the action of the acids of urine and the alkali of soaps, by which it will sooner or later be eaten through. The method devised and patented by Phillips (1888) came nearer the mark, although falling just short of it. Taking a cylinder of the required size, and revolving it in a lathe, he spun in the bottom, out of the material of the sides, under the pressure of a proper tool in the hands of a workman. Not realizing, however, that the operation could be continued until the bottom was complete, a small opening was left at the apex, which he closed by fusing the metal about it by means of a flame. The rudiments of the process in suit may be here, but, as just intimated, the extent to which it could be successfully carried was not seen. The objection to the process, as it stands, is that the surrounding parts are drawn upon at the point of fusion, and thus weakened where they ought, instead, to be made strong. The operation, also, is a divided one, and not continuous, as is the one in suit, which detracts from it commercially. And the comparative merit of the two is well suggested by the fact that for several years past Mr. Phillips, the inventor, has bought traps of the complainants, manufactured by their process, rather than his own. Of even less significance is the British patent to Pittner (1888), by which the defendants seem to set much store. Assuming that the method for closing the ends of tubes or vessels of soft metal, which is there described, could be made effective in the construction of lead traps, which I very much doubt, there is nothing in it to suggest or anticipate anything which we have here. The process simply consists in the concentric forcing together of the end of the tube to be closed by means of revolving squeezing-discs, which, in conjunction with the other apparatus employed, narrow in upon it progressively, until, as it is claimed, a solid end or plug is formed. It is suggested by the appearance of some of the work turned out that the metal is made to yield or flow to a certain extent, under the pressure applied, the same as in the process in suit. But this is not claimed by the inventor, and, however involved, was evidently not appreciated; the effect being actually minimized

by the squeezing discs being made rotary, and so comparatively frictionless. But more than this, even if the tube is capable of being closed in the way stated, and as the result of a sort of spinning of the metal, there is no fusing at the apex or center, under the heat evolved, which, as we shall presently see, is an essential feature of the present process. A machine of the supposed Pittner pattern was set up in court and operated by the defendants at the time of the hearing, but nothing to change these views was produced. More successful experiments are said to have been conducted previously, exhibits of which have been put in evidence. But not only were these on small two-inch pipes, and of chemical instead of commercial lead at that, but they were carried on without any representative of the complainants being present; and at others subsequently undertaken, which were subject to scrutiny, by no means the same results were obtained. The Pittner process was also tested by Mr. Baker, the head of the complainant company, in 1897, after he had lost the suit brought against him for the infringement of the present patent in the Circuit Court of the United States for the District of Massachusetts, before Judge Aldrich, as a possible relief therefrom. But he was compelled to give it up as of no practical value. Doubt is sought to be cast upon what he did, because the wrong shop in Worcester, where his experiments were said to have been conducted, was at first given. But they are too well substantiated otherwise to be so impugned. It is also to be observed that the Pittner patent was evidently regarded by the inventor himself as a commercial failure, as is shown by the fact that he allowed it to lapse in 1893 for nonpayment of the renewal fee. With this record against it, and distinguished as it plainly is in the respect suggested from the process in suit, there is no occasion to let it trouble us.

The only real issue in the case, if, under the evidence, there is indeed that, is the one of infringement. The patent which was issued to Alpheus A. Robinson in 1889 has two claims:

"(1) The improved method of forming the bottoms of lead traps, consisting in taking a tube or cylinder of a sufficient length, and in spinning an end section of the cylinder or tube of sufficient length to or beyond the center of the tube or cylinder, and under a pressure or friction sufficient to cause the metal to flow and unite, and form a homogeneous, seamless, and complete bottom, as and for the purposes specified.

"(2) The improved method of forming lead-trap bodies, comprising the taking of a cylinder or tube of sufficient length to form the wall of proper height, and a continuous, homogeneous bottom, and forming the homogeneous bottom by spinning in, under heat produced by pressure or friction of the spinning-tool during the spinning operation, an end section of the tube or cylinder sufficiently large to form the homogeneous bottom, and continuing said spinning operation under said heat past or beyond the center of the bottom, whereby all the metal of the spun-in section forms a part of the bottom of the trap, and subsequent melting or soldering of the bottom of the trap to close a hole dispensed with, substantially as described."

It is undoubtedly essential to the process so specified, not only to distinguish it from the prior art, but in order that it should have the merit claimed for it, that in the final touch, by which the bottom of the trap is closed, the metal should be made not only to flow, but to fuse or unite, under the force of friction and pressure, at the apex or center, so as to form an integral, imperforate, and homogeneous mass. But the opera-

tion covered by the patent was conducted by skilled workmen with appropriate apparatus in open court at the hearing, and that this condition was fulfilled I observed unmistakably with my own eyes. The metal actually flowed or ran at the close, being held in place by the end of the spinning tool, which was extended under and slightly beyond the center for that purpose. The heat by which this is brought about is, of course, not great. The metal is not molten. It could not, indeed, be spun in that state. But it is decidedly hot, and the action observable, just as the end is closed, is such as to justify the claim that there is a complete fusion at that point. An examination also proves it. Sections of the trap, sawn through the center, being inspected, show the bottom integral in every part. It is true that the union is more perfect in some instances than in others, slight radial seams being sometimes found on the inner surface at the center. But this is negligible; the bottom not only being water-tight, but the attempt to break through where such seams appear being ineffectual, even by heavy pounding, as was demonstrated by the efforts of defendants' counsel to do so in open court.

The defendants contend that they do not infringe, because, while admittedly using the same spinning process to close in the end of the trap, there is no fusing of the metal, which simply flows cold; only sufficient pressure being exerted to bring the contiguous parts firmly and closely together. The lead, in other words, is not, according to this, made plastic, so as to form a simple, homogeneous, and integral whole, such as called for by the patent; and neither is the spinning tool carried to the center, as it is claimed, but is kept just short of that, the bottom ending in a point or nipple in consequence. But no such pretext as this can stand before the facts shown. The defendants not only have the same apparatus, but, to all appearances, make use of it in exactly the same way, and, what is more to the purpose, with precisely the same results attained. The section of lead cylinder from which a trap is to be spun is revolved at a high rate of speed on the mandrel of a lathe, and the operator, exerting a strong leverage by means of a heavy hardwood spinning stick, spins in the end of the trap in a single operation, until it is completely closed. The metal, under the influence of the pressure and friction so brought to bear upon it, necessarily becomes plastic; and the parts about the center are not simply brought together, but are united into a homogeneous whole, indistinguishable from the sides, except as it is thickened up by the extra material spun into it, the same as is proposed by the process in suit. All this is indisputably established (whatever may be testified to the contrary) by sections of the traps manufactured by the defendants, which have been put in evidence, by which it is clearly shown. In no sense is the apex of the trap closed by the surrounding metal being forced together to make a water-tight joint, no such cohesion being possible. The constituent parts are plainly made to fuse or flow into each other, the metal presenting at that point substantially the same character as at every other. That heat is generated in the operation, and contributes to the result, there can be no doubt; and it is no inconsiderable heat, either, being sufficient to sear the end of the wooden spinning stick, as well as to make water sizzle and steam. Nor am I persuaded that the spinning operation is only continued, as contended,

up to the center of the bottom, and not past or beyond it the fractional distance required by experience to completely close the end. Not only is this essential to the process, but the evidence establishes that it is the course actually pursued. The finished product turned out by the defendants shows no such point or nipple at the center as would result from the contrary, or at least only in occasional instances, and then most minute. And we have the direct testimony of Mr. Southgate, who succeeded in getting into the defendants' works at St. Louis along with Mr. Baker, and watched the workmen there, that they spun past the middle, just as was to be supposed. In the face of this, the attempted denial by the defendants is of little avail. The opportunity for evasion is too great to have it accepted, without much more convincing proof than has been produced.

Let a decree be drawn sustaining the patent and finding it infringed, and referring the case to a master to take an account.